Wineman Realty Company v. Commissioner.
Wineman Realty Co. v. Commissioner
Docket No. 109503.
United States Tax Court
1943 Tax Ct. Memo LEXIS 393; 1 T.C.M. (CCH) 791; T.C.M. (RIA) 43136; March 22, 1943
*393 Chester J. McGuire, Esq., for the petitioner. Philip H. Bayer, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding was brought for a redetermination of a deficiency in income tax of $6,121.05 for the year 1938. The amount of the loss from the disposition by petitioner of certain real estate having been stipulated, the only question is whether it is free from the capital loss limitations because involving "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business" (Revenue Act of 1938, section 117(a)). Findings of Fact Petitioner is a corporation organized in 1916 under the laws of the State of Michigan with its principal office in Detroit. It filed its Federal income tax return for the year in question with the collector of internal revenue for the district of Michigan. Petitioner's original stockholders were the same as those of the People's Outfitting Company, and were all members of one family. On its organization petitioner acquired certain real estate from its incorporators in exchange for stock. Petitioner's "Articles of Association" stated that its purpose was "To purchase, *394 hold and deal in real estate." Petitioner is not a real estate broker and did not handle properties for others. Sink, who was petitioner's manager, is a broker. He works for petitioner on a salary. Petitioner is a member of the Detroit Real Estate Board and is affiliated with the National Association of Real Estate Boards. During the years 1924 to 1939, inclusive, petitioner had gross income, of which the amounts indicated were from rents received, as follows: Rents
Total
Included in
Gross
Gross
Year
Income
Income
1924
$185,730.50
$184,276.18
1925
205,469.74
203,998.72
1926
234,697.72
234,363.06
1927
238,172.72
236,709.76
1928
239,063.55
235,543.47
1929
283,812.65
281,858.33
1930
371,547.22
370,145.07
1931
264,576.05
262,399.50
1932
219,405.18
203,480.88
1933
210,057.76
200,781.08
1934
240,611.32
226,883.30
1935
255,234.34
252,626.75
1936
203,390.78
198,362.23
1937
238,937.76
235,828.71
1938
228,526.78
225,468.46
1939
230,367.91
226,893.93
In the years above set out there were two sales of real estate, one in 1932 and one in 1938. The former was store property which had been rented for seven years before sale. Sale was made *395 because the city of Detroit wanted the property. The latter, sold to Montgomery, Ward & Company on August 16, 1938, resulting in a loss of $23,358.20, is the subject of the present controversy. It was part of a tract purchased by petitioner on April 25, 1936, with the expectation of a quick turnover by sale to Montgomery, Ward, as represented to them by the agent for the seller. It was nonproductive property and for this reason petitioner wanted to sell it. On acquisition of the property petitioner gave an option to a contractor who was attempting to get a contract to build the store for Montgomery, Ward. He did not succeed. Montgomery, Ward wanted petitioner to build a store and lease it to them, but petitioner was unwilling to do so because it wanted to sell. Consummation of the sale necessitated 10 to 15 conferences between petitioner's president and Montgomery, Ward's representative. Petitioner made efforts to sell the remainder of the tract and later erected store buildings on the part not so sold (approximately 20 percent thereof) and has them leased. Since its incorporation petitioner has purchased 60 different pieces of real estate, 56 of which it still continues to own. *396 Besides the two properties above mentioned petitioner sold a store building in 1919 which one of petitioner's incorporators had acquired in 1914, and which petitioner had acquired on organization. The property was rented by petitioner until it was sold. Petitioner also sold in 1940 a property improved by two stores at a loss of $25,000 to $30,000. Petitioner had acquired this property in its improved condition in 1921 and had rented out the stores during the period it held the property. It was sold because it was in a section of the city where petitioner owned no other property, the tenant was difficult, and it was more or less undesirable investment property as far as petitioner was concerned. Other of petitioner's properties were listed for sale with brokers. In listings for 1941 and 1942 there was one property which was rented but petitioner wanted to sell it because it had had a taste of more modern properties such as chain store leases, and it now preferred that type. The property listed showed a good return but petitioner wanted the other type property. Another listed property was a gas station it had owned for 10 or 12 years which it desired to sell because it was not modern *397 and it was thought better to sell and buy a new station than to modernize the old one. It also had listed in 1941 and 1942 a partially improved property, which brought small return as a car lot. The improvements, store building with flats and doctor's offices were not old. The listing was solicited. Petitioner, as a matter of policy, would not sell at a loss property showing a good return. If property was not showing a return they would sell it at a loss. About 40 percent of petitioner's properties were unimproved. Some of the unimproved properties were rented for parking lots but with no great return. Petitioner maintained a practice of improving vacant property by erecting a building for a tenant. In 1940 it erected a theater for a tenant on property which it had acquired about 16 years previous. It had purchased this property with the pur pose of reselling it at a profit. In a sworn protest against additional assessment proposed against petitioner for 1938 petitioner's president stated: Immediately after the acquisition of the property, they [petitioner's representative] entered into negotiations with the manager of the real estate department of Montgomery Ward & Company, to *398 effect the sale of the property to that organization. Thereupon the long and protracted negotiations were commenced, which ultimately resulted in the completion of the sale in the early part of 1938. Shortly after the beginning of the negotiations, the taxpayer realized that it had made an unfortunate purchase, and found itself in the possession of seeking out Montgomery Ward, rather than the contrary position. The taxpayer finally agreed to the sale price of $55,000 because it realized that it would probably have to carry this non-productive property for many years. The property as stated was non-productive and the sole reason for the purchase was the profit to be derived from the sale of the property. It has always been the policy of the company to carry productive property and to dispose of it if the income drops below a profitable level. Petitioner's depreciable assets in 1938 were valued at over $1,400,000. Besides its real estate it owned bonds of considerable value. Among petitioner's properties in 1938 were a warehouse, several apartment houses, stores, about six gasoline filling stations, 60 feet on Woodward Avenue, and some 180 acres of unimproved property on Switzer Road *399 which was acquired before 1928 with the idea of subdividing. The decline in the real estate market about that time prevented it from going ahead with this plan, but it has not abandoned the idea. It has made no efforts to sell this acreage lately because such a sale would have to be at a heavy loss. Petitioner was not engaged in the business of buying and selling real estate. The property sold in 1938 was not property held by petitioner for sale to customers in the ordinary course of its trade or business. Opinion We think it clear from the record as a whole that the ordinary course of petitioner's business was the acquisition and maintenance of real property for investment purposes. Notwithstanding this, there can be little doubt that the specific property, the sale of which gave rise to what is claimed as an ordinary loss, was purchased and held primarily for sale. And we are not troubled by the requirement of sale to "customers," for any purchaser under the circumstances would fit that description. . The true issue thus limits itself to whether, under Revenue Act of 1938, section 117, the sale was made in the *400 ordinary course of petitioner's business, a determination which must be made in the light of the possibility that a taxpayer may have more than one business. See . On a consideration of all the circumstances surrounding this transaction we have arrived at the conclusion that it was entirely outside of anything which can properly be described as ordinary in the conduct of petitioner's operations. The usual procedure was either to purchase improved property or, if vacant land was acquired, to construct improvements thereon. In either case and even in several instances of property remaining unimproved, the practice shows a great preponderance of retention and devotion to investment purposes. In one instance, property held for 16 years was ultimately employed as the site for a theater, which was constructed, held, and rented as such. Throughout the period shown by the record, the overwhelming proportion of petitioner's gross income was from rent. This is not to say, of course, that as an adjunct to a business of that nature it might not have been customary for petitioner to make sales of its investment properties. In *401 such a situation the selling operations, although not the principal, might perhaps have been an ordinary feature of the business. See e.g., . But it seems to us such a contention would require as its premise that the sales take place with sufficient frequency and continuity to constitute the usual course of business, rather than as isolated or casual occurrences. Here, in a period of 20 years only three other properties were sold, and "It is apparent from the testimony that the sales * * * were prompted by the fact that the parcels sold were no longer profitable from a rental standpoint, rather than by the thought of making a profit from such sales." . See . The transaction creating the present controversy was thus unique. It was the complete antithesis of anything ordinary or usual. Not only does the history of petitioner's activities demonstrate that its practice was to improve vacant property if a tenant could be found, to retain the property *402 for its rental income, and to sell only when the venture turned unfavorable; but petitioner's principal witness made it clear that more recently its endeavor was to concentrate on chain store leases. It was shown that the outcome thus generally desired could have been achieved with respect to the property in issue. Not only was the Montgomery, Ward Company, which became the ultimate purchaser, interested in the location in question, but its emphatic preference was, as the testimony shows, to have petitioner construct the building so that Montgomery, Ward could rent the finished store, instead of itself becoming the owner. This for some undisclosed reason petitioner in this instance alone refused to do. The best explanation to be drawn from the circumstances as a whole is that petitioner hoped to capitalize on the known interest of Montgomery, Ward in the site, and to make a quick turnover by selling the lot to it at a profit. This is so unparalleled in petitioner's history, as the evidence shows it, that we are unable to find that the transaction bore any resemblance to petitioner's ordinary business. We have accordingly found as a fact that the property in question, although intended *403 for sale, was held as such by petitioner apart from any aspect of the ordinary course of business. Decision will be entered for respondent.